Filed 9/27/13  P. v. Manafov CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>VUSAL MANAFOV et al.,<br><br>    Defendants and Appellants. | C069505<br><br>(Super. Ct. Nos.<br>62100706A/62100706B) |

Over a two-week period, defendant Vusal Manafov robbed several gas stations off of Interstate 80.  On at least one occasion, he was joined by defendant Eugene Rice; Manafov was the robber and Rice drove the getaway car.  A jury found Manafov guilty of two counts of robbery (Pen. Code,[1] § 211), and found true the allegation that he personally used a firearm in committing each offense (§ 12022.53, subd. (b)).  A different jury in the same trial found Rice guilty of one count of robbery, and he admitted a prior conviction for voluntary manslaughter that qualified as both a strike (§ 1170.12, subds.

---

[1] Further undesignated statutory references are to the Penal Code.

1

(a)-(d); § 667, subds. (b)-(i)) and a serious felony (§ 667, subd. (a)).  The trial court sentenced Manafov to 17 years and 4 months in prison and Rice to 9 years in prison. Both appeal.

On appeal, Rice claims error in the admission of (1) evidence of a suspicious vehicle at another gas station, (2) his paystub and a traffic ticket in the car, (3) a jail note used to show consciousness of guilt, and (4) a detective's opinion testimony about the identity of a person (the driver) in a surveillance video.  He also contends the trial court erred in failing to instruct the jury with CALCRIM No. 371, and that the admitted accomplice testimony required corroboration.  He claims cumulative error and argues insufficient evidence to support his robbery conviction.

Manafov contends the trial court erred in admitting evidence of two prior robberies and in permitting a detective to testify as to his opinion of the identity of the robber shown on surveillance videos.  He also claims he received ineffective assistance of counsel in several respects.

As we will explain, we find error in permitting the detectives to testify as to what they observed on the surveillance videos and the conclusions they drew regarding the identity of the robbery participants.  Such testimony usurped the function of the jury.  We also conclude that the trial court erred in failing to instruct the jury sua sponte on the law of accomplice testimony.  Nevertheless, because we find these errors harmless, we shall affirm.

## FACTS

*August 7 Robbery at Penryn Valero (Manafov only)*

Sukhwant Grewal was working as a cashier at the Valero gas station in Penryn early in the morning of August 7, 2010.  At about 1:45 a.m., Manafov entered and robbed him.  Manafov wore a sports cap covered with a black hood.  He took a burrito from the freezer, put it on the counter, and handed Grewal money.  When Grewal made change,

2

Manafov showed Grewal a gun and demanded he hand over all the money, in a bag. A video surveillance camera captured the robbery.

Grewal called 911 and the police arrived in about five minutes. Grewal was unable to select the robber from a lineup, but was able to identify a similar gun. The robber did not appear intoxicated.

*August 10 Robbery at Colfax Chevron*

On August 9, 2010, Rice, Manafov, and Jarnee Rivers[2] left Oakland and went to Sacramento. While there, Rice said they were going to "hit a lick," meaning commit a robbery. They drove on Interstate 80 towards Reno.

Just after midnight on August 10, 2010, the clerk at the Penryn 76 gas station and his girlfriend saw a car approach and slow down. It first stopped near the entrance and then drove to the back where it stopped near an open door and the car's occupants looked inside. The car was red with no license plates. There were three occupants who all appeared to be male. The driver wore a fur-lined hood and the person in back wore black. The car sputtered off, as if the driver were unskilled in driving a manual transmission, and entered the freeway going east. The clerk and his girlfriend thought it was suspicious and called the police.

Charles McIntyre was working at the Colfax Chevron station that morning. The station is about 100 yards from the interstate. A male customer, Manafov, entered around 1:00 a.m. and selected a beverage. As McIntyre took his money and opened the cash drawer, Manafov produced a revolver. He pointed it at McIntyre and told him to empty the registers, giving McIntyre a small black plastic bag for the money. The robber was in

---

[2] At the time of the robberies, Rivers was in a romantic relationship with Manafov and was pregnant with his child. At trial, she testified she was still in love with him, although by the time of trial she was pregnant with another man's child.

3

his 20's and wore a black-hooded sweatshirt over a cap with red on it. He repeatedly told the clerk to hurry up, that he was not fast enough. The robber had a foreign accent. As the robber turned to leave he told McIntyre to "have a nice day." The robber took $1,377. McIntyre identified Manafov as the robber from a photographic lineup.

Officer Jack Hickey was on patrol and responded to the early morning call from the Chevron station. He watched the surveillance video of the robbery. It showed a vehicle pull in the north end of the station and park. A white male passenger walked to the store. The driver wore a white baseball cap. The car was red with no license plate. It had a DMV sticker on the left rear window, and a sunroof. Hickey gave a description of the suspect vehicle to dispatch. The suspect was wearing a red Oakland A's cap, a black-hooded sweatshirt, and black pants and had a large wristwatch. He had a black revolver and a black plastic bag for the money.

Almost a half hour after the dispatch, a CHP officer saw a red sedan with no license plates, a sunroof, and three people inside. He followed it, waiting for backup. The car took the Kingvale exit and stopped, and then got back on Interstate 80.

When backup arrived, the officers conducted a felony stop. Manafov was the driver, Rice the front passenger, and Rivers was in the rear seat. All three were arrested. Rice was wearing a white tank top with a blue outer shirt; both Rivers and Manafov were dressed in black. Manafov did not appear to be under the influence of drugs.

Red and white baseball caps were seized from the car. The white cap was later found to contain hairs consistent in length to Rice's hair. There were multiple items of clothing in the trunk, including a jacket with a fur hood, as well as license plates. A loaded, black revolver was found under the hood of the car. A black plastic bag with money was under the rear seat. An employee time card and a traffic ticket, both in Rice's name, were also found in the car.

Rivers testified that she was asleep during part of the drive, but awoke when Manafov and Rice changed places. She heard the trunk and the hood slam. Rice got in the passenger seat and handed her a black bag and told her to put it under the seat.

*Interview of Rivers*

Detective Bill Summers interviewed Rivers. In the first interview, Rivers said she fell asleep outside Sacramento. At one point, the car pulled over and she heard the trunk slam. Rice was wearing a white shirt. She called him "Bra" (meaning brother) as he was like a brother to her. Someone passed her a black bag with money. Both Rice and Manafov drove; she did not see who went in the gas station.

Just before this interview ended, Rivers asked what was going to happen to her. The detective said she would be held for investigation of armed robbery. When the tape was turned off, Rivers told the detective that she saw Manafov, whom she referred to as Babe, come out of the Chevron. The tape was turned on and Rivers repeated it. She said Rice drove; she did not see anything until he pulled off and he and Manafov switched places and she heard the slamming. Rice passed her the bag. After this interview, as Summers walked Rivers to booking, she said she remembered something. Summers turned on the tape again and Rivers said that while in Sacramento, Rice said they were going to "hit a lick."

*Uncharged Robberies*

At trial, the parties stipulated to two uncharged robberies committed by Manafov; this evidence was before only Manafov's jury. On July 26, 2010, at 4:20 a.m., Manafov entered a Valero gas station in West Sacramento and brought merchandise to the counter. He pointed a black revolver at the clerk and demanded money. After the clerk gave Manafov money, he left. Manafov's fingerprints were on the merchandise.

At 4:43 a.m. that same day, Manafov entered a AM/PM minimart in Davis and brought merchandise to the counter. Again, he pointed a black revolver at the clerk and

5

demanded money.  The clerk gave him money from the register and Manafov left.  His fingerprints were on the merchandise he took to the counter.

*The Jail Note*

About two months after the robberies while Manafov and Rice were in jail, an officer saw Rice approach a door between housing units and put a piece of paper through the door.  Another inmate approached and pulled out the note.  He set it on a table and pointed to Manafov, who took the note.  Officers intervened and collected the note.

The note read:  "Congratulations on the baby.  After my potne [*sic*] seen Latifa and Kimora[3] Big Ass coming together, he put 2 & 2 together.  Now he can see that you're getting at him with my lawyer and said shit.  They're trying to get you home fast by making you go against my potne by making you think my potne going against you!  That dude is a convict who live under oath with other convicts, so if he rat or get ratted on[,] his own oath will prevail & punish the "rat" in any CDC yard.  His thinking is to ride it out with you for the best deal you can get, then subpoena you to court so you can testify for him and let them know he didn't drive or know what was going on.  Then he could show this to his family in the pen that you should be our lil bra."[4]

*Testimony about Surveillance Videos*

Surveillance video captured both the Valero robbery and the Chevron robbery.  The video of the Chevron robbery was admitted into evidence as Exhibit 1 and played to both juries.  The video of the Valero robbery was admitted into evidence as Exhibit 56 and played for Manafov's jury.

---

[3]  Rivers was also known as Kimora.  Latifa was Manafov's mother.

[4]  The People argued Rice "obviously" wrote this note, speaking of himself in the third person ("my potne").  The People explained the note's meaning as follows: Rice would not implicate Manafov because Rice lived by the "convict oath."  If Manafov turned against Rice, he would be punished, but if he testified on Rice's behalf, Rice would offer him protection in prison.

Detective Summers testified the driver shown in the Chevron video was not consistent with Rivers's appearance. The driver wore a white hat and a white shirt and had short hair and was a large person. That description did not fit Rivers but was consistent with Rice, who was wearing a white tank top at booking. The detective could not determine the race of the driver from the video, but he looked darker than a white person or the passenger who entered the store (Manafov).

Detective Michael Simmons testified he viewed both videos. The red Lexus shown in the Valero video was similar to the Lexus impounded after the Chevron robbery. They were both red and had the same light configurations and rims and neither had license plates. Other similarities were the sunroof and the DMV sticker in the rear window.

After reviewing the two videos, Simmons noticed several similarities between the two robberies. The suspects both wore a black-hooded sweatshirt with a red baseball cap underneath with a white "A" insignia. "You had the same suspect, same height, same stature, same walk, same mannerisms." Simmons testified the behavior of the robber was the same in each video. The videos were also similar in the same respects to those in the (uncharged) West Sacramento and Davis robberies. The only difference was the color of the bottom part of the clothing. The same car was used in each robbery and in three, including the two most recent, the getaway driver began driving away before the robber was completely in the car.

*Rice's Defense*

Rice's defense was primarily to attack the credibility of Rivers who testified he said they were going "to hit a lick." To that end, he presented the testimony of a loss prevention officer about Rivers's shoplifting in 2009.

*Manafov's Defense*

Manafov admitted he committed the Valero and Chevron robberies, but claimed he was forced to do so by Rice. Manafov was 23 at the time of the robberies, while Rice

7

was 42. Manafov had met Rice five years earlier, but their relationship tightened in 2010. After Rice's wife threw him out of the house, Rice was always angry and spent more time with Manafov. Rice had financial problems and suggested they rob people. The next day they picked up Rice's gun from a house in Vallejo.

Manafov claimed Rice made him ingest ecstasy and cocaine and that he was under the influence during each robbery. Manafov felt he could not refuse. He was afraid of Rice and knew that he had used a gun and attacked people. Rice told him he had killed someone and spent six years in prison. Manafov was concerned for his family and for Rivers. Rice harassed Rivers and wanted her to have sex with him. Rice had threatened Manafov with the gun before the Chevron robbery; Rice hit him with his hand and the gun.

Manafov never called the police about these threats. Manafov never ran because Rice "has people who knew him."

Rivers testified Rice threatened Manafov "plenty of times." Rice had snatched money from him and pushed him. Rice was very intimidating and Rivers believed he had hurt her sister. Like Manafov, Rivers never told the police about Rice's threats.

A police officer and a phlebotomist testified Manafov's blood was drawn at the jail. A toxicology analysis showed no cocaine or other narcotics; the blood sample screened positive for marijuana. Manafov denied anyone drew his blood. He claimed he had never seen the phlebotomist before.

## DISCUSSION

### I

*Rice's Contentions*

A. *Admission of Suspicious Car at Penryn 76 Station*

Rice contends the trial court erred in admitting evidence of the suspicious red car at the Penryn 76 station. He contends the evidence was inadmissible evidence of prior

bad acts.[5]  He asserts the evidence was not probative of Rice's identity as the driver of the car or his intent to commit robberies.  Further, he contends the evidence was inadmissible "profile" evidence.

Prior to trial, Rice moved to exclude evidence of the suspicious car based on relevancy (Evid. Code, § 350) and prejudice.  (Evid. Code, § 352.)  The People argued evidence that the occupants of the car were "casing" a gas station 30 minutes before the Chevron robbery was relevant to prove their intent to rob.  Rice argued the evidence was irrelevant because the witnesses could not identify the occupants of the car.  The trial court ruled the evidence admissible.

Only relevant evidence is admissible.  (Evid. Code, § 350.)  Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  "'While there is no universal test of relevancy, the general rule in criminal cases might be stated as whether or not the evidence tends logically, naturally, and by reasonable inference to establish any fact material for the prosecution or to overcome any material matter sought to be proved by the defense.  [Citation.]  Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury.'"  (*People v. Freeman* (1994) 8 Cal.4th 450, 491 (*Freeman*).)  Such material facts include identity, intent or motive.  (*People v. Bivert* (2011) 52 Cal.4th 96, 116.)  "The trial court has considerable discretion in determining the relevance of evidence.  [Citations.]"  (*People v. Williams* (2008) 43 Cal.4th 584, 633-634.)

---

[5]  The parties dispute whether Rice has preserved an objection that that admission of the evidence violated Evidence Code section 1101 because he failed to cite that section of the Evidence Code below (see Evid. Code, § 353).  Because Rice's main contention is that the evidence was not relevant, we consider its relevancy without resolving the forfeiture issue.

Rice contends the evidence was not probative to prove his intent to rob because the evidence did not establish that *he* was in the red car at the Penryn gas station or that driving around and stopping constituted "casing" the station for a robbery. In other words, Rice contends the evidence was not persuasive enough to be relevant. We disagree. "[I]t is universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue, but only have 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' [Citation.]" (*New Jersey v. T.L.O.* (1985) 469 U.S. 325, 345 [83 L.Ed.2d 720, 737].)

Here, the suspicious car evidence has some tendency in reason to prove the occupants of the red car were seeking a gas station to rob that night. Witnesses saw the same car associated with the robbery of the Chevron station less than an hour later driving slowly and stopping to look inside the 76 gas station. They found the conduct sufficiently suspicious to call the police. The driver of the car was wearing a fur-lined hood similar to that found in the red Lexus after the Chevron robbery, leading to the reasonable inference that the previous driver was still in the car. Any defect in linking Rice to the car's driver was cured at trial when Rivers testified he was wearing the jacket with the fur-lined hood found in the car. The jury could reasonably infer the suspicious conduct of the car was, as the People argued, best interpreted as casing the gas station for a robbery; the significance of the car's conduct was a question for the jury to determine.

Rice contends the suspicious car evidence was improper "profile" evidence. In support, he cites cases that held it error to admit evidence of the profile of a particular type of criminal. (*People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1072 [testimony about typical drug dealer]; *People v. Hernandez* (1997) 55 Cal.App.4th 225, 242 [crime analyst testimony analogous to profile evidence]; *People v. Martinez* (1992) 10 Cal.App.4th 1001, 1004 [expert opinion on auto theft rings].) There was no such evidence here. No expert testified the actions of the red car at the 76 station indicated

10

planning for a robbery. Instead, witnesses described the actions and the jury was free to draw its own conclusions based on experience and common sense.

Rice also cites to *People v. Long* (1970) 7 Cal.App.3d 586 (*Long*), in which this court reversed a conviction for passing a forged check. We found reversible error in admitting evidence of three other forgeries because there was insufficient evidence to tie defendant to those forgeries. (*Long, supra,* 7 Cal.App.3d at p. 590.) *Long* is distinguishable. Here, Rice was sufficiently linked to the actions of the red car by the fur-lined hood, the fact that he was found in the car less than two hours after the activity at the 76 station, and by Rivers's testimony.

The trial court did not abuse its discretion in admitting evidence of the suspicious red car at the 76 station in Penryn.

### B. Admission of Timecard and Traffic Ticket

Rice next contends the trial court erred in admitting into evidence two items found in the car after his arrest: his paystub (or employee time card) and a traffic ticket issued to him while driving the same car on July 26, 2010. Rice moved pretrial to exclude this evidence. The trial court denied his motion, reasoning that this evidence linked Rice to the car used in the Chevron robbery. Rice contends the trial court's logic was flawed because the issue was whether he participated in the robbery and evidence linking him to the car does not prove he aided and abetted the robbery.

We find no abuse of discretion in admitting this evidence. The traffic ticket was evidence that Rice had driven the same car in the past. The evidence of his paystub showed that Rice had a more substantial and ongoing connection to the car (and Manafov) than as a mere passenger; he kept personal items in it. Both pieces of evidence, when added to other evidence showing Rice was the driver the day of the Chevron robbery, tended to show he aided and abetted Manafov in the robbery.

We recognize that the evidence of the pay stub and traffic ticket standing alone was too weak to show Rice's involvement in the *robbery*. But even weak evidence may

11

nonetheless be relevant. (*Freeman, supra,* 8 Cal.4th at p. 491.) In *Freeman*, the court found evidence that defendant possessed a white plastic bag similar to that used in the robbery was relevant, even though the bag was not connected to the robbery and many people possess such common, unremarkable items. "Evidence that defendant possessed a plastic garbage bag shortly after the crime, coupled with the evidence that the shooter in the bar used a plastic garbage bag, tended to show that defendant was the shooter, which is a material fact in the case. Standing alone the inference may have been weak, but that does not make the evidence irrelevant. The fact that many persons may similarly have possessed such bags may diminish the strength of the evidence, but it does not make it irrelevant." (*Freeman, supra,* at p. 491.)

A trial court does not abuse its discretion by admitting into evidence defendant's possession of a weapon that *could have been* the murder weapon. (See *People v. Mills* (2010) 48 Cal.4th 158, 197 ["Because defendant was accused of killing the victim by cutting her throat and shortly after the crime was found in possession of several cutting devices, any one of which could have been the murder weapon, the trial court acted within its discretion in finding the evidence to be relevant"].) By the same reasoning, here the trial court did not abuse its discretion in admitting as relevant evidence that showed Rice *could have been* the driver of the car.

### C.     Admission of Jail Note

Rice also contends the trial court abused its discretion in admitting evidence of the jail note. He argues the note did not, as the People argued, show that he was attempting to bribe Manafov and suppress evidence. He asserts the note was not self-authenticating and there was no evidence he wrote the note and no evidence that the note referred to this case. We disagree.

Again, the gist of Rice's argument is that because the evidence was not absolutely conclusive, it should not have been admitted. A trial court's ruling on the admission of evidence, particularly the relevance of the evidence at issue, is subject to the abuse of

12

discretion standard of review. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) "A defendant's willful suppression of evidence, or willful attempt to suppress evidence, is admissible to prove consciousness of guilt." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1007 (*Edelbacher*), citing Evid. Code, § 413.) "That the jury also could draw reasonable inferences from the evidence that might not support a finding of guilt does not make the evidence irrelevant." (*People v. Alexander* (2010) 49 Cal.4th 846, 905-906.)

Here, there was evidence from which the jury could reasonably infer that Rice wrote the note. He was seen slipping the note into the door between the housing units; an inmate then picked up the note and gestured to Manafov to take it. The note referred to Manafov's future fatherhood and called Manafov's girlfriend and mother by name, facts that Rice would likely have known. The note refers to the only pending case against Rice, the Chevron robbery. The note mentions a specific, key fact about the pending case; it asks Manafov to testify "and let them know he didn't drive or know what was going on." That fact goes directly to whether Rice was the getaway driver and aided and abetted the robbery, the key to Rice's defense. The note indicates that if Manafov testifies against Rice he will be punished as a "rat," but if he testifies as Rice wants, Rice will tell "his family in the pen that you should be our lil bra!" From this threat and promise, the jury could reasonably conclude Rice was attempting to suppress or fabricate evidence, thus showing his consciousness of guilt.

The facts giving rise to an inference of consciousness of guilt need not be conclusively established; there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference. (*People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 102.) Since such facts were present here, the trial court did not abuse its discretion in admitting the jail note into evidence.

D.      *Failure to Instruct with CALCRIM No. 371*

Rice contends the trial court compounded the error in admitting the jail note by failing to instruct sua sponte (with CALCRIM No. 371) the jury that if it found Rice

13

attempted to suppress or fabricate evidence, such consciousness of guilt evidence was insufficient alone to establish Rice's guilt.[6] Relying on *People v. Atwood* (1963) 223 Cal.App.2d 316 (*Atwood*), Rice contends the trial court had a duty to instruct sua sponte on the limitations of consciousness of guilt evidence.

In *Atwood*, there was evidence that defendant denied knowledge of a burglary or being on the premises where the burglary occurred, but remained silent when informed that his palmprint had been found. (*Atwood, supra,* 223 Cal.App.2d at p. 321.) The appellate court held that because this evidence was crucial in the case, the trial court was required to instruct on whether defendant's silence was an implied admission and that, if so, the jurors could consider the evidence as "tending to prove a consciousness of guilt but not sufficient of itself to prove guilt, the weight and significance thereof to be a matter for their determination." (*Atwood, supra*, at p. 333.)

We disagree that *Atwood* imposes a duty to instruct sua sponte on consciousness of guilt in this case. First, *Atwood* was limited to "the particular evidentiary circumstances of the case." (*Atwood, supra,* 223 Cal.App.2d at p. 334.) Second, our Supreme Court disagrees with defendant's interpretation of *Atwood*.

In *People v. Najera* (2008) 43 Cal.4th 1132 (*Najera*), our Supreme Court answered no to the question of whether the trial court was required to sua sponte instruct the jury that possession of recently stolen property was insufficient alone to establish guilt of a theft related offense. (*Najera, supra,* 43 Cal.4th at p. 1134.) "Where, as here, an instruction simply informs the jury that a fact or cluster of facts is not, without more, substantial evidence of guilt under the ordinary legal rules set forth elsewhere in the

---

[6] Defendant argues the trial court should have instructed with CALCRIM No. 371 as follows: "If defendant tried to create false evidence or obtain false testimony, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

instructions, we have not imposed a duty on trial courts to provide such an instruction sua sponte. For example, the instructions concerning consciousness of guilt (CALJIC Nos. 2.03, 2.04, 2.05, and 2.06) recite that such evidence is not sufficient by itself to prove guilt, yet we have never held that the trial court has a sua sponte duty to instruct the jury accordingly. [Citation.]" (*Najera, supra,* at p. 1139.) Addressing *Atwood,* the court noted, "We do not read *Atwood* as imposing a categorical duty on trial courts to instruct on these issues. [Citation.]" (*Najera*, *supra,* at p. 1139, fn. 3.) The court cited to *People v. Carter* (2003) 30 Cal.4th 1166, 1197 (*Carter*), which questioned the "continuing vitality" of *Atwood* on the duty to instruct sua sponte on adoptive admissions.

Rice argues the language in *Najera* is dicta because it did not involve a consciousness of guilt instruction and is therefore inapposite. He contends *Atwood* should control. We disagree. Tellingly, Rice does not address *Carter*, or its questioning of *Atwood*. Our review of *Najera* and *Carter* convinces us that the trial court here had no duty to instruct sua sponte on the limitations of the jail note as consciousness of guilt evidence.

### E.  *Detective Summers's Opinions on the Surveillance Video*

Rice further contends the trial court erred in permitting Detective Summers to testify as to what he saw on the surveillance video. Summers testified the video showed the driver of the getaway car was a large person who wore a white hat and a white shirt and appeared to have short hair. He further testified that this description matched Rice, but not Rivers. Rice contends this interpretation of the video was improper lay opinion and imposed on the jury's role as factfinder.

Before trial, Rice moved that "no person be permitted to testify as to what they saw on the surveillance video or be allowed to interpret or narrate the video as it is being shown to the jury." He argued such testimony would be hearsay and prejudicial. At the hearing, Rice argued the video was clear as to who the driver was and "the jury has eyes of their *[sic]* own."

15

The court ruled that Summers could testify he reviewed the video and what his observations were, specifically mentioning his testimony at the preliminary hearing that the driver appeared to be African-American and wearing a white cap and shirt. The court ruled that Summers could not narrate the video or "draw ultimate conclusions that would wander into the purview of the jury. It is for the jury to decide who was driving the vehicle after they have heard all the evidence." The court granted Rice's request for a continuing objection.

Generally, the testimony of a witness is limited to matters of which he has personal knowledge. (Evid. Code, § 702, subd. (a).) Lay opinion testimony is admissible if it is both rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800; *People v. Bradley* (2012) 208 Cal.App.4th 64, 83 (*Bradley*).) The decision whether to permit lay opinion rests in the sound discretion of the trial court. (*Bradley*, *supra,* at p. 83.)

We agree with Rice that the trial court erred in permitting Summers to describe what he saw on the surveillance video as to the identity of the driver. Neither criterion for lay opinion was established. Summers was not present when the video was made and did not see the driver of the red car. The video was admitted into evidence and the jury was able to evaluate what it showed as to the driver. Summers's testimony served only to give the jury his opinion as to what the video showed. While the People could certainly argue the video showed Rice was the driver, it was improper for a law enforcement officer to testify to his observations and opinion of the very same evidence the jury was charged with evaluating. This is because the jurors may have deferred to Summers's observations as to what the video showed over their own observations, due to his status as a law enforcement officer. Indeed, in closing argument the prosecutor argued the jury heard the description of the driver based on the video "from a veteran detective of the Placer County Sheriff's Department," who "has been working crimes against persons for decades."

16

The People contend Summers did not give an opinion, but testified only to the "facts" shown on the video. Those facts and any inferences therefrom, however, were for the jury to determine, not Summers. "With limited exceptions, the factfinder, not the witnesses, must draw the ultimate inferences from the evidence." (*People v. Melton* (1988) 44 Cal.3d 713, 744.)

Although we find error in admitting Summers's description of the driver from the video, we conclude the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). Under *Watson*, the trial court's judgment may be overturned only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson, supra,* 46 Cal.2d at p. 837.) It is not probable Rice would have received a more favorable result without Summers's testimony.[7]

In addition to Summers's testimony, evidence that Rice was the getaway driver included the testimony of Rivers, Rice's similarity to the driver as shown on the video and by his clothing when arrested, and the jail note. We observe the video (Exhibit 1) clearly shows the driver wearing a white hat and a white or light colored shirt, just as Summers testified. The video was shown to the jury at trial, and in closing arguments both counsel urged the jury to watch it. The jury was thus able to compare the driver shown on the video with both Rice and Rivers, who were present in court. The clothing alone strongly indicated the driver was Rice, not Rivers, because Rice was wearing a white tank top when arrested, while Rivers was in black. Further, a white cap was found in the car, containing a hair similar to Rice's.

---

[7] We requested and received the surveillance videos of the charged crimes, Exhibits 1 and 56, and have viewed them. For this reason, we earlier denied Rice's motion to augment the record to include these same videos.

17

*F.       Failure to Instruct on Accomplice Testimony*

Rice contends the trial court erred in failing to instruct sua sponte that Rivers was an accomplice and therefore her testimony should be viewed with distrust and required corroboration.  (See CALCRIM No. 335.)  Rice contends that since the driver of the getaway car was either Rice or Rivers, Rivers should be considered an accomplice as a matter of law.  In the alternative, he contends the jury should have been instructed to determine if Rivers was an accomplice.  (See CALCRIM No. 334.)  We agree with the second point, that the jury should have been instructed with CALCRIM No. 334, but find the failure to instruct on accomplice testimony harmless because there was sufficient corroboration for Rivers's testimony.

Section 1111 provides:  "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."  The purpose of section 1111 is "[t]o ensure that a defendant will not be convicted solely upon the testimony of an accomplice because an accomplice is likely to have self-serving motives."  (*People v. Davis* (2005) 36 Cal.4th 510, 547.)

"Under section 1111, an accomplice is 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.'  To be chargeable with an identical offense, a witness must be considered a principal under section 31.  [Citations.]  An accomplice must have "'guilty knowledge and intent with regard to the commission of the crime.'"  [Citation.]  [¶]  'If there is evidence from which the jury could find that a witness is an accomplice to the crime charged, the court must instruct the jury on accomplice testimony.  [Citation.]  But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and,

18

in that situation, need not instruct the jury on accomplice testimony. [Citation.]' [Citations.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 368-369, fn. omitted (*Lewis*).)

Under section 31 a principal includes an aider and abettor. An aider and abettor is one who (i) aids, promotes, encourages or instigates a crime, (ii) with knowledge of the unlawful purpose of the perpetrator, and (iii) the intent to assist in the commission of the crime. (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1158.) It is not enough that the person charged as an aider and abettor give assistance with knowledge of the perpetrator's criminal purpose. (*People v. Beeman* (1984) 35 Cal.3d 547, 556-561.) Mere presence at the scene of a crime, knowledge of the perpetrator's criminal purpose, or the failure to prevent the crime do not amount to aiding and abetting. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 272-273 (*Garcia*).) "Factors to be considered by the trier of fact in determining 'whether one is an aider and abettor include presence at the scene of the crime, failure to take steps to attempt to prevent the commission of the crime, companionship, flight, and conduct before and after the crime.' [Citation.]" (*Garcia, supra,* 168 Cal.App.4th at p. 273.)

Here, there is sufficient evidence from which the jury could, but was not required to, find that Rivers was an accomplice in that she acted with guilty knowledge and intent. It is clear that she knew Manafov and Rice's illegal purpose, having heard Rice say they were going to "hit a lick." Despite this knowledge, she took no steps to disassociate herself from their activity. Rice gave her the plastic bag with the stolen money and it was found tucked under the back seat. From this evidence, the jury could infer that Rice would not have trusted Rivers with the stolen money unless she was part of the robbery team and shared their intent. Rivers was arrested with Manafov and Rice, and only was forthcoming with the police when she realized she could be charged with robbery. She was originally charged with robbery, but the charges were dismissed. She was granted

19

immunity to testify.[8]  Thus the trial court should have instructed the jury sua sponte on accomplice testimony.  However, any error in its failure to do so was harmless.

"A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record.  [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.  [Citations.]'  [Citation.]  The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'  [Citation.]" (*Lewis, supra,* 26 Cal.4th at p. 370.)  "Although the evidence offered in corroboration must connect the accused with the commission of the crime charged, it 'may be slight and entitled to little consideration when standing alone.'  [Citations.]" (*People v. Tewksbury* (1976) 15 Cal.3d 953, 969.)

Here, sufficient evidence corroborated Rivers's testimony that Rice was involved in the robbery and drove the getaway car.  The surveillance video showed the driver wearing a white hat and white or light-colored shirt, and the driver fled the scene after the robbery before the robber was completely inside the car, indicating the driver knew of the robbery.  Rice was arrested soon after the robbery wearing a white tank top; a white cap containing a hair similar to his was found in the car.  Further, the jail note, which asked Manafov to testify the "potne" "didn't drive or know what was going on," provided evidence that Rice drove *and* was involved in the robbery.

---

[8]  "The fact that a witness has been charged or held to answer for the same crimes as the defendant and then has been granted immunity *does not necessarily establish* that he or she is an accomplice." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90, italics added (*Stankewitz*).)  The jury can, however, still consider these facts in determining whether a witness is an accomplice.  Although the People rely on *Stankewitz*, they fail to recognize that the court in that case *did* instruct the jury to consider if the witness was an accomplice; the issue was whether the court should have instructed the witness was an accomplice *as a matter of law*. (*Stankewitz, supra,* 51 Cal.3d at p. 90.)

G.    *Cumulative Error*

Rice contends the cumulative effect of the errors deprived him of a fair trial.  We disagree.

"[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.)  "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.'  [Citation.]" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)  We have found two errors, but we find them harmless for the reasons discussed *ante*, whether considered individually or together.  "Defendant was entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

H.    *Sufficiency of Evidence*

Finally, Rice contends his robbery conviction was not supported by substantial evidence.  This contention is based on his assertion that neither the video evidence nor the testimony of Rivers was solid, credible evidence.  He argues Rivers was an accomplice and her testimony was not corroborated because the video was too grainy to show anything of substance about the driver.  Having rejected those contentions *ante*, we now reject his contention of insufficient evidence.

II

*Manafov's Contentions*

A.    *Admission of Uncharged Robberies*

Manafov contends the trial court erred in admitting the evidence of his two uncharged robberies, outlined *ante*.  He contends there were insufficient similarities between the uncharged robberies and the charged offenses to permit the admission of the uncharged robberies to show identity.  He argues the trial court applied the wrong standard to the analysis, and contends that due to the additional robberies' admission, he was denied his right to a fair trial.

21

"Evidence of the defendant's commission of a crime other than one for which the defendant is then being tried is not admissible to show bad character or predisposition to criminality but it may be admitted to prove some material fact at issue, such as motive or identity. (Evid. Code, § 1101.) Because evidence of other crimes may be highly inflammatory, its admissibility should be scrutinized with great care. [Citation.]" (*Edelbacher, supra,* 47 Cal.3d at p. 1007.) "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 (*Ewoldt*).)

"The inference of identity need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together. [Citations.]" (*People v. Scott* (2011) 52 Cal.4th 452, 473 (*Scott*).) The common marks of the uncharged and uncharged crimes standing alone need not be particularly distinctive, so long as in the aggregate, the similarities become more meaningful, leading to the reasonable inference that defendant was the person who committed all the crimes. (*People v. Medina* (1995) 11 Cal.4th 694, 748-749.)

We review the trial court's determination of the admissibility of evidence of a prior uncharged crime under the abuse of discretion standard. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) The trial court's ruling need not be "unassailable." "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

Here, as presented to the trial court at the motion in limine, the uncharged and charged robberies were sufficiently similar "to support the inference that the same person committed both acts." (*Ewoldt, supra*, 7 Cal.4th at p. 403.) The robberies all occurred within a two-week period, late at night or early in the morning, at gas station markets located very near to Interstate 80. All four robberies included a red Lexus with no plates and a sunroof, and distinctive wheel rims, an older beat up black revolver, a black-hooded sweatshirt, and the robber's taking an item to the clerk, waiting until the register was opened to display a gun, and then demanding money be put in a bag.

Further, although the trial court did discuss admitting the evidence of the uncharged robberies to show a common plan, it was ultimately admitted only on the issue of identity. The trial court clearly stated the proper test under *Ewoldt*, that identity required the highest degree of similarity, greater than that required to show a common plan. Although Manafov faults the trial court for failure to state the similarities show a "signature," the court's recitation of the common features was sufficient to show "substantial but lesser distinctiveness" resulting in "a distinctive combination when considered together." (*Scott, supra,* 52 Cal.4th at p. 472.) The law requires no more.

Manafov further contends the prejudicial effect of uncharged crimes evidence required exclusion of the evidence. We agree that "Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citation.]" (*Ewoldt, supra,* 7 Cal.4th at p. 404.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352,

23

"prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

In considering whether the probative value of the uncharged misconduct is outweighed by the prejudice under Evidence Code section 352, we must evaluate the inflammatory nature of that evidence, the probability of confusion, consumption of time, remoteness, probative value, as well as other unique factors presented. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 917; *People v. Harris* (1998) 60 Cal.App.4th 727, 738-740.) While the other crimes evidence was certainly damaging as it provided strong evidence of Manafov's identity as the robber (reinforced by McIntyre's identification and the testimony of Rivers), it was not unduly prejudicial.

Here, the uncharged crimes evidence was no more inflammatory than the evidence of the charged offenses. Indeed, the evidence of the Chevron robbery was the most inflammatory, as McIntyre testified he thought about his children when Manafov pointed a gun at him and Manafov left with the sarcastic comment, "Have a nice day." Nothing in the record suggests the jury was confused by the evidence of uncharged robberies, which took little time as it was presented in two short stipulations. The evidence was not at all remote; the other crimes occurred within two weeks of the charged offenses. Finally, the evidence was highly probative on the central and disputed issue of Manafov's identity as the robber.

The trial court did not abuse its discretion in admitting the evidence. Because we find no error in the admission of this evidence, we reject Manafov's claim that trial counsel was ineffective in arguing for exclusion. Manafov cannot show any prejudice from this alleged deficiency. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126 (*Rodrigues*) [successful claim of ineffective assistance of counsel requires showing a reasonable probability of a more favorable determination without counsel's unprofessional errors].)

B.    *Ineffective Assistance of Counsel: Admission of Jail Note*

As discussed *ante*, Rice sought unsuccessfully to exclude a seized jail note that was admitted to show his consciousness of guilt.  At the time of Rice's motion to exclude, Manafov's counsel indicated the note might be relevant to his client's state of mind.  The trial court directed him to file a motion in limine and include points and authorities if he wanted that issue considered.  After the People rested the case against Manafov, he asked to admit the jail note to show that Rice had threatened him.  The trial court, after researching the issue, declined to admit the note for that purpose.

On appeal, Manafov contends trial counsel was ineffective with respect to arguing for admission of the jail note.  "Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.]  If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails."  (*Rodrigues, supra,* 8 Cal.4th at p. 1126.)

Manafov has failed to make the required showing to prevail on a claim of ineffective assistance of counsel.  He asserts only that the jail note "arguably" showed the parties' state of mind.  This assertion is insufficient to establish that trial counsel was deficient because Manafov has not shown a more effective counsel would have succeeded in admitting the jail note.  Nor has Manafov shown that he was prejudiced by the failure to admit the note in his case; he has not shown a reasonable probability of a more favorable result if the note had been admitted.  We do not serve as "backup appellate counsel," or make the parties' arguments for them.  (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545.)  Manafov's claim fails.

### C.     Ineffective Assistance of Counsel: Multiple Defenses

Manafov next contends he was denied effective assistance of counsel in presenting a defense.  After the trial court permitted introduction of Manafov's uncharged robberies, Manafov abandoned any attempt to convince the jury that he was not a participant in the charged robberies.  Instead, Manafov admitted his participation but raised the defenses of duress, legal necessity, and intoxication.[9]  On appeal, Manafov asserts the latter two defenses lacked evidentiary support.  There was no evidence to show he had no legal alternative as required to establish a defense of legal necessity, and the intoxication defense was refuted by the toxicology evidence.  He contends trial counsel failed to act as a diligent advocate in raising these defenses, and the effect was to dilute the one plausible defense of duress, all to Manafov's prejudice.

In addressing a claim of ineffective assistance of counsel, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674, 699] (*Strickland*).)

The standard of prejudice to establish ineffective assistance of counsel is well settled.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at p. 698].)

---

[9]  We recognize that intoxication is not truly a defense; it only negates specific intent. (See *People v. Saille* (1991) 54 Cal.3d 1103, 1117-1120.)

26

Manafov has failed to show a reasonable probability of a different outcome if trial counsel had focused solely on the defense of duress. Duress requires that the defendant show that he acted under an *immediate threat* of harm and reasonably believed his life was in danger, such that the defendant did not have time to form the required criminal intent. (§ 26, subd. Six; *People v. Heath* (1989) 207 Cal.App.3d 892, 899-901.) "[A] fear of *future* harm to one's life does not relieve one of responsibility for the crimes he commits." (*People v. Lewis* (1963) 222 Cal.App.2d 136, 141, original italics.)

While Manafov presented evidence (his and Rivers's testimony) that he and Rivers feared Rice, Rice had made some threats and once hit Manafov, and Rice "harassed" Rivers, there was *no* evidence that Manafov reasonably believed there was an immediate threat to his or Rivers's life when Manafov went into the gas stations to commit robbery. As the People pointed out, Manafov possessed the only gun among the three and he never tried to get away from Rice or call for help. Trial counsel described Manafov's testimony on the issue of defense as a "fortress," and unsuccessfully moved for a judgment of acquittal on that basis. The trial court, however, found the argument that Manafov was a victim "bordering on offensive." "The jury didn't buy the defense of duress, and neither does the court." Given the weak evidence of duress and the strong, indeed overwhelming, evidence of Manafov's guilt, a different result was not reasonably probable if trial counsel had focused exclusively on the defense of duress. (*Watson, supra,* 46 Cal.2d at p. 836.)

D.     *Detective Simmons's Opinions on the Surveillance Video*

In a supplemental brief, Manafov contends the trial court erred in admitting Simmons's testimony that based on his viewing of the surveillance videos, the robber in the Valero robbery was the same person as the robber in Chevron robbery. Simmons also testified to various other similarities between all four robberies. Manafov contends this was improper opinion testimony concerning identity because Simmons had no personal knowledge of Manafov.

27

The People respond that Manafov forfeited this contention because he did not object at trial on the basis of improper identification testimony. We disagree. Rice did object to *anyone* testifying solely as to what appeared on the videos. Manafov argued he agreed with Rice and questioned the testimony's validity and use. Further, it appears an objection by Manafov to Simmons's testifying as to what he observed on the videos would have been futile given the trial court's ruling permitting Summers's nearly identical testimony. (See *People v. Welch* (1993) 5 Cal.4th 228, 237 ["Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile. . . ."].) Lastly, Manafov claims his trial counsel was ineffective in failing to specifically object to this testimony. Accordingly, we reach the merits.

For the same reasons we have set forth *ante* as to the testimony of Summers regarding his observations of the Chevron video, it was error to permit Simmons to testify as to what he saw on the surveillance videos--especially the surveillance videos of the uncharged crimes, which videos were not before the jury. This is particularly true of his conclusion that the similarities of the robberies showed the robber was the same person in each. "Witnesses must ordinarily testify to facts, leaving the drawing of inferences or conclusions to the jury or court." (*Froomer v. Drollinger* (1962) 201 Cal.App.2d 90, 98; also *People v. Williams* (1992) 3 Cal.App.4th 1326, 1332.)

But again we hold the error harmless. It is not probable Manafov would have received a more favorable result without Simmons's testimony. The evidence that Manafov was the robber in both the Valero and Chevron robberies was overwhelming. Indeed, Manafov concedes as much if, as we have held, the evidence of the uncharged crimes was properly admitted. McIntyre identified Manafov as the Chevron robber, and Grewal identified his gun in the Valero robbery. The same red car, a car registered to Manafov, was used in all the robberies. As explained *ante*, the numerous similarities between the robberies supported the inference that the same person committed all of them. (See *Ewoldt, supra*, 7 Cal.4th at p. 403.) Further, the jury watched the

28

surveillance videos of the Valero and Chevron robberies, just as Simmons did, and the information about which he testified was as available to the jury to view directly as it was to Simmons. Even Simmons's improper inferences that the same robber committed these two robberies were clearly based on facts readily apparent to anyone viewing the two videos. Thus, absent Simmons's improper testimony, the jury would still have reached the same conclusion that Manafov was the robber in both robberies.

## DISPOSITION

The judgment is affirmed.


                                               DUARTE            , J.


We concur:


          ROBIE            , Acting P. J.


          BUTZ            , J.


29